UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BRIAN G. ADAMS,

       *Plaintiff*,

*v.*

COMMISSIONER OF SOCIAL SECURITY,

       *Defendant*.

_____/

CASE NO. 14-14724

DISTRICT JUDGE MATTHEW F. LEITMAN
MAGISTRATE JUDGE PATRICIA T. MORRIS

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON CROSS MOTIONS FOR SUMMARY JUDGMENT (Docs. 13, 16)

## I.   RECOMMENDATION

In light of the entire record in this case, I suggest that substantial evidence supports the Commissioner's determination that Adams is not disabled. Accordingly, **IT IS RECOMMENDED** that Adams' Motion for Summary Judgment (Doc. 13) be **DENIED**, that the Commissioner's Motion for Summary Judgment (Doc. 16) be **GRANTED**, and that this case be **AFFIRMED**.

## II.   REPORT

### A.   Introduction and Procedural History

Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred to the undersigned magistrate judge for the purpose of reviewing a final decision by the Commissioner of Social Security ("Commissioner") denying Plaintiff's claims for the Disability Insurance Benefits ("DIB") program of Title

II, 42 U.S.C. § 401 *et seq*. (Doc. 6; Tr. 1-3). The matter is currently before the Court on cross-motions for summary judgment. (Docs. 13, 16).

Plaintiff Brian Adams was fifty-two years old when he applied for benefits on May 12, 2012. (Tr. 126). This application was denied on July 13, 2012. (Tr. 56). Adams requested a hearing before an Administrative Law Judge ("ALJ"), which took place before ALJ Neil Sullivan on August 8, 2013. (Tr. 24-55). Adams, represented by attorney J. Gregory Frye, testified, as did vocational expert ("VE") Heather Benton. (*Id*.). On August 19, 2013, the ALJ issued a written decision in which he found Adams not disabled. (Tr. 10-19). On October 21, 2014, the Appeals Council denied review. (Tr. 1-3). Adams filed for judicial review of that final decision on December 15, 2014. (Doc. 1).

### B.    Standard of Review

The district court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). The district court's review is restricted solely to determining whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F. App'x 502, 506 (6th Cir. 2014) (internal citations omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted).

The Court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989). The Court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id*. at 286 (internal citations omitted).

### C.      Framework for Disability Determinations

Under the Act, "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI). The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . .

physical or mental ability to do basic work activities," benefits are denied without further analysis.

Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.

Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five:  Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

20 C.F.R. §§ 404.1520, 416.920. *See also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his or] her impairments and the fact that she is precluded from performing [his or] her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC [residual functional capacity] and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

4

### D.     ALJ Findings

Following the five-step sequential analysis, the ALJ found Adams not disabled under the Act. (Tr. 19). The ALJ found at Step One that Adams had not engaged in substantial gainful following the alleged onset date, December 16, 2009. (Tr. 12). At Step Two, the ALJ concluded that Adams had the following severe impairments: "disorders of the back, neck, shoulder, and trapezius status-post cervical fusion at C4-6, hypertension, myofascial pain and other reported chronic pain." (*Id.*). At Step Three, the ALJ found that Adams' combination of impairments did not meet or equal one of the listings in the regulations. (Tr. 13-14). The ALJ then found that Adams had the residual functional capacity ("RFC") to perform light work, except that Adams "should never climb ladders, ropes or scaffolds, and can only occasionally climb ramps or stairs. In addition, the claimant can only occasionally stoop, kneel, crouch, crawl or balance. Finally, the claimant should avoid concentrated exposure to the use of hazardous machinery, operational control of moving machinery, and unprotected heights." (Tr. 14-17). At Step Four, the ALJ found that Adams was able unable to perform any past relevant work. (Tr. 18). At Step Five, the ALJ found that Adams retained the ability to perform a significant number of jobs which exist in the national economy. (Tr. 18-19). As a result, the ALJ found Adams not disabled under the Act. (Tr. 19).

5

E.     **Administrative Record**

1.     **Medical Evidence**

In January 2009 Adams sought treatment for neck and shoulder pain. (Tr. 541). In February 2009, Adams complained of worsening anxiety. (Tr. 539). In July 2009 he complained of back pain without radiation. (Tr. 537).

On July 7, 2009, Adams treated with Dr. Erin Murfey, who found evidence of cervicalgia and cervical radiculopathy, but with full strength in the upper extremities. (Tr. 323). On that same date, a scan of Adams' spine was interpreted by Dr. L. Anderson to show degenerative changes at C5-C6 with encroachment upon the neural foramina, along with slight narrowing at C5-C7. (Tr. 427).

On July 17, 2009, Dr. John Hopkins interpreted an MRI scan of Adams' spine, finding moderate-severe right foraminal stenosis with impingement at C3-C4, moderate-severe left foraminal stenosis at C4-C5 with impingement on the left C5 nerve root, along with some stenosis at C5-C6 and C6-C7, and other degenerative changes. (Tr. 232-33).

On July 21, 2009, Dr. Umesh Verma found some evidence of median neuropathy in both wrists. (Tr. 320).

On July 31, 2009, Adams rated his functional level at eight out of ten, but also rated his pain at eight out of ten; Adams noted that he enjoyed hunting and fishing. (Tr. 250). In August 2009, Adams asserted following rehabilitation that he felt zero pain with movement, had no complaints of pain or numbness generally, and had good strength throughout. (Tr. 237, 243).

6

In December 2009 Adams experienced some cardiovascular distress, including abnormal EKG findings. (Tr. 274-86).

In July, September, and October of 2009, Adams treated with Dr. Nilesh Kotecha, who recommended therapy for carpal tunnel syndrome, administered steroid injections to relieve neck pain, and noted abnormal discographies at all levels tested; surgery was recommended. (Tr. 309).

On December 16, 2009, Adams underwent a spinal fusion surgery; the surgery was performed without complications, and his preoperative and postoperative diagnoses were both "[m]ultilevel cervical spondylosis without myelopathy." (Tr. 419).

In a January 2010 follow-up appointment, Dr. Kotecha noted that Adams was "doing beautifully," and that his x-rays "look[ed] excellent. (*Id.*). Also in January 2010, Dr. P.C. Patel found satisfactory appearance of Adams' cervical fusion at C4-C6, with moderate degenerative disc disease at C6-C7. (Tr. 408).

In March, August, and September 2010, Adams again treated with Dr. Kotecha, who noted that Adams' x-rays looked "very good" following his spinal surgery, that he had "good strength throughout both is upper extremities," but with some mild disc degeneration at C6-C7. (Tr. 305). Adams complained of some bilateral upper extremity discomfort, particularly in the left extremity. (*Id.*).

Also in March 2010, Dr. Mohamed Asad interpreted a scan of Adams' spine, finding stable anterior fusion at C4-C6, stable degenerative disease at C6-C7, and "some

increased narrowing of the anterior aspect of the C3-C4 disc space on the flexion view" without "pathologic subluxation or instability" on flexion or extension. (Tr. 398-99).

Also in August 2010, Dr. P.C. Patel reviewed a scan of Adams' spine, which he interpreted as a "satisfactory appearance of the cervical fusion at C4-C6, along with "[e]arly cervical spondylotic changes at C3-C4 and moderate cervical spondylotic C6-C7 level." (Tr. 396).

Adams complained of shoulder pain and depression on November 26, 2010. (Tr. 525). D.O. Legere-Struntz recorded that Adams' pain was not relieved with medication, and was consistently getting worse. (*Id*.). Adams also said that his depression was making it difficult to meet his obligations at home and work. (*Id*.). His cervical spine showed spasms, and was tender, but had full range of motion; Adams also had spasms in the thoracic spine. (*Id*.). His grip was "good" bilaterally. (*Id*.).

On December 3, 2010, Dr. Diedre Redd noted that Adams' cervical fusion resolved most of his pain, with the exception of "some left upper trapezius discomfort extending into the left arm and around the periscapular area." (Tr. 331). Adams stated that he experienced pain at a rate of eight out of ten, and that he experienced occasional numbness. (*Id*.). Despite this, Adams was able to rest easily through the night, and occasionally took Tylenol for pain relief, but was "not terribly interested in taking too many medications." (*Id*.). Dr. Redd thus characterized Adams' pain as "relatively well controlled," and dependent upon his activity level, noting his penchant for hunting and

8

fishing; she recommended "just doing a few sessions of outpatient physical therapy to primarily address stretching and a home exercise program." (Tr. 332).

On January 3, 2011, Dr. Diedre Redd noted that physical therapy resolved Adams' pain, but that his symptoms rapidly returned. (Tr. 327). Adams complained of tightness in the periscapular area. (*Id*.). Dr. Redd made note of Adams' high degree of activity, including chopping wood for his stove at home, loading large diameter wood that was four feet long into his stove, and that he did not experience notable pain when engaging in this exercise. (*Id*.). Adams did not seem to experience his pain during the treatment sessions, and rated his pain at zero out of ten. (Tr. 327-28). Adams showed no cervical or periscapular pain, along with full range of motion and strength in his upper limbs. (*Id*.).

On January 31, 2011, Dr. Diedre Redd recorded complaints of left upper limb and left parascapular pain, which had improved by half over the prior month, such that Adams rated his then-current discomfort at zero out of ten, with his worst pain rating at three out of ten. (Tr. 325). Adams was well enough to perform a home exercise program daily, along with performing "a lot of" wood hauling and chopping. (*Id*.). Adams experienced some soreness in the cervical spine, which his wife treated with massage. (*Id*.). In Adams' own estimation, he was "doing well." (*Id*.). He had normal range of motion in his cervical spine, with no paraspinal tenderness, and normal strength and reflexes in his upper limbs. (*Id*.).

On October 20, 2011, D.O. Legere-Struntz recorded complaints of chronic, constant pain in the cervical spine, which Adams said ranged from minimal to extreme.

9

(Tr. 513). Adams reported that he suffered severe pain for several days after attempting to work. (*Id*.). The physician encouraged Adams to seek disability. (*Id*.).

On November 21, 2011, Adams was admitted to the hospital for abdominal pain; Adams also complained of hypertension, back pain, insomnia, abdominal pain, and depression.   (Tr. 369-71). Adams' pain resolved on its own; he was diagnosed with nonspecific colitis and discharged. (Tr. 376-77, 382).

On December 5, 2011, Adams complained of neck pain with radiation into the face, arm, elbow, wrist, which was aggravated by walking and turning his head. (Tr. 342). He reported that injections helped temporarily, he experienced side effects that led him to cease using Cymbalta, and rarely took Ultram because it was ineffective. (*Id*.). Adams had decreased range of motion in the cervical spine, but with normal gait. (Tr. 344).

On January 16, 2012, Adams treated with D.O. Michelle Brewer for moderate pain occurring intermittently, and ranging from three out of ten to ten out of ten. (Tr. 338). He was prescribed with a TENS pain relief unit. (Tr. 340).

On February 2, 2012, Adams treated with D.O. Lisa Legere-Struntz, complaining of pain in the neck, shoulders, and arms. (Tr. 504). Adams' anxiety and depression were noted to be controlled with treatment. (*Id*.). He was positive for back pain, bone and joint symptoms, and muscle weakness. (Tr. 505). He rated his pain at two out of ten. (Tr. 506).

On February 28, 2012, Adams told D.O. Brewer of "mild" but constant and worsening pain in his neck, head, shoulder, and arms. (Tr. 334). However, Adams also

10

claimed that his pain ranged from two out of ten to ten out of ten. (*Id.*). Adams was prescribed pain relief medication and scheduled for a follow-up. (Tr. 336-37).

On July 3, 2012, Adams was evaluated by Michigan State Disability Determination Services physician Dr. Karen Krieger. (Tr. 443). Dr. Krieger noted complaints of back and neck pain, arthritis, hypertension, cardiomyopathy, heat intolerance, insomnia, obesity, acid reflux, and depression. (*Id.*). Adams asserted that he could dress and feed himself, stand for twenty minutes at a time, walk ten minutes, sit for sixty minutes, lift ten pounds with either arm, and could perform household chores in short intervals. (*Id.*). Adams was properly dressed and groomed, could follow complex commands without difficulty, his recent and long-term memory appeared intact, he was pleasant and cooperative, and his intellectual function was generally normal. (Tr. 443-44). Adams had no tenderness in the cervical spine or dorsolumbar spine and showed no paravertebral muscle spasms or tenderness. (Tr. 444). His elbows and shoulders were nominal. (Tr. 445-46). Adams' wrists were normal, and his grip strength was about sixty pounds bilaterally. (Tr. 446). Dr. Krieger found that Adams could perform all tested activities, including pushing, pulling, squatting, hopping on and off the examination table, and lift light weights, among others. (Tr. 447). Adams' gait was normal, he could walk on heels and toes, and he was comfortable seated and supine. (Tr. 448). Dr. Krieger diagnosed Adams with low back pain, neck pain with bilateral radiculopathy, hypertension, history of cardiomyopathy, controlled acid reflux, depression, and difficulty with sleep. (*Id.*).

11

In July 2012, state agency physician Dr. B.D. Choi found, based on a review of Adams' medical transcripts, that he could perform "light work" with certain postural limitations, including a limitation to only occasionally climbing ramps, stairs, or ladders, and only occasionally balancing, stooping, kneeling, crouching, and crawling. (Tr. 63-64).

On January 18, 2013, Adams sought treatment from D.O. Lisa Legere-Struntz for ongoing beck pain, depression, anxiety, and hypertension. (Tr. 493). Adams was found to be anxious, but did not suffer from paranoia, had normal insight, normal judgment, and a normal attention span. (Tr. 494).

On February 6, 2013, Adams treated with Dr. Heather Lara, complaining of burning, sharp neck pain with radiation into the shoulder and arms. (Tr. 449). Dr. Lara recommended Adams undergo an MRI scan to determine the nature of his pain. (Tr. 451).

On February 19, 2013, Adams treated with Dr. Frederick Vincent, Sr. (Tr. 452). Adams reported that his pain attenuated following his 2009 neck surgery, but that he began to experience bilateral trapezius pain and spasms about five months later, accompanied with a burning sensation in the left arm. (*Id*.). Adams asserted that nocturnal use of wrist splints abated his paresthesia by morning. (*Id*.). Adams' muscle bulk and strength were normal in his arms and hands, and his reflexes were symmetrical. (*Id*.). An electrodiagnostic examination revealed no evidence of cervical radiculopathy, brachial plexopathy, proximal mononeuropathy, polyneuropathy, or myopathy in the upper limbs. (Tr. 453). Dr. Vincent concluded that it was "possible [Adams] has an

12

atypical C6 sensory radiculopathy, but I don't think that he has a focal mononeuropathy or plexopathy as a cause of this symptom," that Adams' hand paresthesia was unchanged by his surgery, that he suffered from minimal carpal tunnel, and that his "proximal left upper limb sensory problems he is experience [has nothing] to do with the distal median neuropathy on the left." (*Id*.). Dr. Vincent found that Adams did not require any immediate treatment for his median neuropathies, and instead would wait for the results of an MRI that would be performed the same day. (Tr. 453).

Also on February 19, 2013, Adams treated with Dr. Hedstrom-Lara. (Tr. 457). That physician found that Adams suffered from trapezius spasms, likely myofascial in origin, minimal carpal tunnel, and episodic bilateral paresthesia of the hand. (Tr. 458). That physician also recorded that Adams' "[e]pisodic left upper limb burning sensation" was what "really bother[ed] him the most especially as the day progresses." (*Id*.). Depending on the results of an MRI, the physician noted that referral to a pain specialist may be appropriate. (Tr. 458-59).

On February 26, 2013, Adams again treated with Dr. Hedstrom-Lara, who reviewed an MRI of Adams' spine, finding that he had "left sided neural foraminal stenosis at C6/7 and he may benefit from a[ pain relieving] injection on the left at that level." (Tr. 460-62).

On March 4, 2013, Adams treated with D.O. Michael Wheeler, who noted burning pain radiating into the left arm, along with some paresthesia, but without weakness. (Tr. 463). Adams stated that his pain ranged from mild to severe, and acknowledged some

13

relief through medication, but asserted that physical therapy and a pain relieving injections did not help. (Tr. 463). D.O. Wheeler found decreased range of motion in the neck, normal gait, 5/5 strength in all major muscle groups, normal neurological response, and no abnormalities in terms of mental status. (Tr. 465). D.O. Wheeler discussed pain relief injections, and scheduled two such procedures. (*Id*.). On March 22, 2013, D.O. Wheeler performed an injection. (Tr. 467). On April 5, 2013, Adams returned for another injection, but asserted that he experienced no relief from the first injection. (Tr. 470). Adams reported his pain at seven out of ten prior to the second injection. (Tr. 471). Immediately following the procedure, Adams asserted that his pain was reduced to two out of ten. (*Id*.).

On April 18, 2013, Adams returned to D.O. Wheeler reporting "slight relief" from his second injection, such that his pain was "tolerable at rest," but that he experienced limited activity tolerance. (Tr. 473). Adams was negative for depression, anxiety, and sleep disturbance; his gait, muscle strength, and psychiatric status were similarly normal. (Tr. 473-74). D.O. Wheeler concluded that Adams was "doing better . . . but not significantly or such that his function has really improved. He is still hoping to avoid another surgery but may consider it if non-surgical treatment fails." (Tr. 475). Adams was prescribed a larger dose of Neurontin to treat his pain. (*Id*.).

On May 10, 2013, Adams underwent a third pain relieving injection at the hands of D.O. Wheeler, who recorded that Adams' pain was reduced from three or four out of ten before the procedure to one out of ten afterward. (Tr. 477). On May 23, 2013, Adams

reported no "additional relief beyond the first two epidurals," such that his "pain is better at rest [but] his functional tolerance has not improved significantly." (Tr. 479). D.O. Wheeler noted that Adams was considering filing for disability at that time. (*Id.*). Adams was negative for depression. (Tr. 480).

On May 29, 2013, Dr. Hedstrom-Lara recorded that Adams obtained one week of relief from his injections, and denied any change to his arm or neck pain since his last visit. (Tr. 482). She also recorded that "[t]he main part that bothers him is left radicular arm pain that radiates into his left third finger;" Adams denied any weakness. (*Id.*). His gait was normal, muscle and strength were grossly normal, and Adams retained a full, painless range of motion in all joints. (Tr. 484). The physician discussed the possibility of an exploratory surgery to determine the cause of his pain, but Adams declined. (*Id.*).

In April and July 2013, Adams sought treatment of a rash. (Tr. 486-89). The only mention of his muscular condition was a note that he experienced "[e]xtremity weakness and numbness in extremities." (Tr. 491). In July 2013 D.O. Legere-Struntz noted that Adams "[w]as recently camping and tubing down the AuSable." (Tr. 486).

### 2. Application Reports and Administrative Hearing

#### a. Adams' Function Report

On June 13, 2012, Adams completed a function report in which he asserted that he was unable to work because of difficulty standing or sitting for more than one hour, walking, raising his arms, and turning his head. (Tr. 201). He reported that his daily activities included walking around the house when he felt able to do so, sitting in his easy

chair, taking pills, talking to and visiting friends, and watching television. (Tr. 202). He reported sleeping difficulties, along with difficulty performing all personal care activities, particularly those which require raising his arms, which he noted cause pain that can last minutes or hours. (*Id*.). Adams wrote that he did not require reminders to take medicine or go places, and did not prepare his own meals. (Tr. 203). He was able to mow his lawn, but doing so took "all day" because his neck hurts and he must rest; he also noted that he had to "putter" with household repairs. (*Id*.). Adams wrote that he left housework to his wife "when [his] neck gets to hurting." (Tr. 204). He got out of the house as often as possible, was able to drive, and could go out alone. (*Id*.). His wife performed all shopping and paid all the bills; Adams said he was unable to pay bills, handle a savings account, or use a checkbook, but also reported that his ability to perform these activities was not impacted by his illnesses. (Tr. 204-05). Adams reported that his hobbies included hunting, fishing, wood-working, and camping, but stated that he "rarely" went fishing, "almost never" hunted, no longer performed woodworking, but still camped "once or twice a summer," but that his wife did most of the work. (Tr. 205). Adams elsewhere specified that he went fishing two or three times per season, and could not walk for hunting purposes. (Tr. 202). His social activities included speaking to his mother and friends on the phone daily; he did not visit friends or have friends visit him. (Tr. 205-06).[1] Regarding his lifting ability, Adams asserted that he could lift five pounds  without

---

[1] The Court notes that Adams directly contradicts himself in his function report, writing that his daily activities include "[v]isit[ing] friends" and later writing that since his

pain, but that any repetitive reaching above his shoulders caused neck and arm pain. (Tr. 206). He could walk fifty yards without rest, and wrote that he would have to wait for an hour before his "neck and arm pain . . . calm down." (*Id*.). He could pay attention for thirty minutes, followed instructions without issue, but did not finish what he started. (*Id*.). He reported responding to stress "not very well." (Tr. 207). In a comment section, Adams wrote that he "was stick of taking all these pills and quit taking them," but that after two days he was "so crippled up that he had to resume taking his medications." (Tr. 208). Finally, he wrote that he "has been messed up since Dr. Katecha [sic] did his neck surgery!" (*Id*.).

### b.    Adams' Testimony at the Administrative Hearing

At the August 8, 2013, hearing before the ALJ, Adams testified that he suffered from "bad nerves" in his neck, a "bad lower back," heart problems, dizziness, shooting pain into his shoulders and hands, headaches, and numbness. (Tr. 33-36). He testified that his pain was variable, such that he could be "perfectly good one hour, and the next hour I feel like I could lay down and die somewhere;" Adams further asserted that he experiences this extreme pain four or five times a day. (Tr. 36). He noted that his neck surgery and epidural injections provided only temporary relief. (Tr. 37). Adams acknowledged that he could lift objects above head level, but had to do so slowly, and could not perform a job requiring such motions repetitively. (*Id*.). Adams said he always

---

illnesses he "[d]on't go to friends [sic] homes anymore. Don't have friends over to my house." (Tr. 202, 206). The ALJ did not make note of this discrepancy. Nevertheless, the Court notes this contradiction as additional support for the ALJ's credibility finding.

experiences back pain, and that it aggravates with walking, bending, and sitting for extended periods. (Tr. 37-38). Adams also spoke of problems with his heart, resulting in shortness of breath, and experiencing sweatiness. (Tr. 39). In terms of depression, Adams noted that feels down about losing the ability to participate in his hobbies, but said that he was "all right with other people" despite his depression. (Tr. 40). Adams also asserted that he lacks motivation, and that his medications leave him feeling tired. (*Id.*). Adams said he could sit and stand for ten to fifteen minutes before experiencing significant neck pain and back pain. (Tr. 40-41). He could walk 100 yards without a break, could carry a trash bag that distance to the road, and could carry a gallon of milk. (Tr. 42-43). Adams also said he could take a flight of steps up and down, but could not do so multiple times daily. (Tr. 43). Bending hurt his back, and bending or squatting caused dizziness. (*Id.*). He could "absolutely not" vacuum the house because of arm pain, did not do the dishes for fear of back pain, and could not carry laundry baskets comfortably. (Tr. 44). Adams said he did not drive unless it was necessary because of neck pain. (*Id.*). Adams also said he shopped for groceries with his wife weekly, but sometimes had to sit down while shopping. (*Id.*). He could hold his arms up in front of himself for about ten minutes. (Tr. 46). Adams could no longer fish or hunt because he could not carry a gun or cast a rod. (*Id.*). Adams said he mowed the grass, but did so ten minutes at a time, and testified that doing so took him two days. (Tr. 47). Finally, Adams acknowledged that he was terminated from his last job during a recession, and was unable to secure work thereafter. (Tr. 47-48).

18

### c.       The VE's Testimony at the Administrative Hearing

The ALJ first asked the VE to characterize Adams' past relevant work. (Tr. 52). The VE found that Adams worked as a machine assembler and a construction worker. (*Id.*). The ALJ then asked the VE a series of hypothetical questions to determine whether Adams is capable of completing competitive, remunerative work. (Tr. 50). First, he asked the VE to assume a person of identical age, education, and vocational history to Adams, who could perform light work, but who could "never climb ladders, ropes, or scaffolds, but could occasionally climb ramps or stairs, and could occasionally stoop, kneel, crouch, crawl, and balance. Additionally, the individual should avoid concentrated exposure to the use of hazardous machinery, operational control of moving machinery, and unprotected heights." (Tr. 52-53). The VE testified that such a person could not perform Adams' past relevant work. (Tr. 53). However, the VE also found that such a person could work as a hand packager (9,000 jobs in Michigan), material handling (1,200 jobs), or production worker (12,000 jobs). (*Id.*).

The ALJ then added a limitation that the hypothetical worker would be off task up to twenty percent of the day; the VE testified that such a limitation would preclude competitive employment. (Tr. 54). Similarly, the VE found that a limitation to three absences per month would be work-preclusive. (*Id.*). Adams' attorney asked whether a limitation to extreme temperatures, particularly those over eighty degrees Fahrenheit, would preclude competitive work; the VE found that such a limitation would preclude about fifty percent of the positions listed. (*Id.*).

19

F.     **Governing Law**

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B). The regulations carve the evidence into various categories, "acceptable medical sources" and "other sources." 20 C.F.R. § 404.1513. "Acceptable medical sources" include, among others, licensed physicians and licensed or certified psychologists. *Id.* § 404.1513(a). "Other sources" include medical sources who are not "acceptable" and almost any other individual able to provide relevant evidence. *Id.* § 404.1513(d). Only "acceptable medical sources" can establish the existence of an impairment. SSR 06-03p, 2006 WL 2329939, at *2. Both "acceptable" and non-acceptable sources provide evidence to the Commissioner, often in the form of opinions "about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." *Id.* at *2. When "acceptable medical sources" issue such opinions, the regulations deem the statements to be "medical opinions" subject to a multi-factor test that weighs their value. 20 C.F.R. § 404.1527. Excluded from the definition of "medical opinions" are various decisions reserved to the Commissioner, such as whether the claimant meets the statutory definition of disability and how to measure his or her residual functional capacity. *Id.* at 404.1527(d).

The ALJ must use a six-factor balancing test to determine the probative value of medical opinions from acceptable sources. 20 C.F.R. § 404.1527(c). The test looks at whether the source examined the claimant, "the length of the treatment relationship and

20

the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). *See also* 20 C.F.R. § 404.1527(c). ALJs must also apply those factors to "other source" opinions. *See Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540-42 (6th Cir. 2007); SSR 06-3p, 2006 WL 2329939, at *2.

Certain opinions of a treating physician, in contrast, receive controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2). *See also Wilson*, 378 F.3d at 544. The only opinions entitled to dispositive effect deal with the nature and severity of the claimant's impairments. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2. Therefore, the ALJ does not owe a treating opinion deference on matters reserved to the Commissioner. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2. The ALJ "will not give any special significance to the source of an opinion" regarding whether a person is disabled or unable to work, whether an impairment meets or equals a Listing, the individual's RFC, and the application of vocational factors. 20 C.F.R. § 404.1527(d)(3).

The regulations mandate that the ALJ provide "good reasons" for the weight assigned to the treating source's opinion in the written determination. 20 C.F.R. §

21

404.1527(c)(2). *See also Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir.

2007). Therefore, a decision denying benefits

> must contain specific reasons for the weight given to the treating
> source's medical opinion, supported by the evidence in the case
> record, and must be sufficiently specific to make clear to any
> subsequent reviewers the weight the adjudicator gave to the treating
> source's opinion and the reasons for that weight.

SSR 96-2p, 1996 WL 374188, at *5 (1996). *See also Rogers*, 486 F.3d at 242. For

example, an ALJ may properly reject a treating source opinion if it lacks supporting

objective evidence. *Revels v. Sec. of Health & Human Servs*, 882 F. Supp. 637, 640-41

(E.D. Mich. 1994), *aff'd*, 51 F.3d 273, 1995 WL 138930, at *1 (6th Cir. 1995)

(unpublished table decision).

An ALJ must analyze the credibility of the claimant, considering the claimant's

statements about pain or other symptoms with the rest of the relevant evidence in the

record and factors outlined in Social Security Ruling 96-7p. Credibility determinations

regarding a claimant's subjective complaints rest with the ALJ. *See Siterlet v. Sec'y of

Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987). Generally, an ALJ's

credibility assessment can be disturbed only for a "compelling reason." *Sims v. Comm'r

of Soc. Sec.*, No. 09-5773, 2011 WL 180789, at *4 (6th Cir. Jan. 19, 2011) (citing *Smith

v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001)); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d

387, 390 (6th Cir. 2004).

The Social Security regulations establish a two-step process for evaluating

subjective symptoms, including pain. 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL

22

374186, at *2. The ALJ evaluates complaints of disabling pain by confirming that objective medical evidence of the underlying condition exists. The ALJ then determines whether that condition could reasonably be expected to produce the alleged pain or whether other objective evidence verifies the severity of the pain. *See* 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2; *Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994). The ALJ ascertains the extent of the work-related limitations by determining the intensity, persistence, and limiting effects of the claimant's symptoms. SSR 96-7p, 1996 WL 374186, at *2.

While "objective evidence of the pain itself" is not required, *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986) (quotation omitted), a claimant's description of his physical or mental impairments alone is "not enough to establish the existence of a physical or mental impairment," 20 C.F.R. § 404.1528(a). Nonetheless, the ALJ may not disregard the claimant's subjective complaints about the severity and persistence of the pain simply because they lack substantiating objective evidence. SSR 96-7p, 1996 WL 374186, at *1. Instead, the absence of objective confirming evidence forces the ALJ to consider the following factors:

    (i)    [D]aily activities;
    (ii)   The location, duration, frequency, and intensity of . . . pain;
    (iii)  Precipitating and aggravating factors;
    (iv)  The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;
    (v)   Treatment, other than medication, . . . received for relief of . . . pain;
    (vi)  Any measures . . . used to relieve . . . pain.

23

20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). *See also Felisky v. Bowen*, 35 F.3d 1027, 1039-40 (6th Cir. 1994); SSR 96-7p, 1996 WL 374186, at *3. Furthermore, the claimant's work history and the consistency of his or her subjective statements are also relevant. 20 C.F.R. § 404.1527(c); SSR 96-7p, 1996 WL 374186, at *5.

The claimant must provide evidence establishing her RFC. The statute lays the groundwork for this, stating, "An individual shall not be considered to be under a disability unless he [or she] furnishes such medical and other evidence of the existence thereof as the Secretary may require." 42 U.S.C. § 423(d)(5)(A). *See also Bowen*, 482 U.S. at 146 n.5. The RFC "is the most he [or she] can still do despite his [or her] limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. § 404.1545(a)(2). A hypothetical question to the VE is valid if it includes all credible limitations developed prior to Step Five. *Casey v. Sec. of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993); *Donald v. Comm'r of Soc. Sec.*, No. 08-14784-BC, 2009 WL 4730453, at *7 (E.D. Mich. Dec. 9, 2009).

### G.    Analysis

Adams argues that the ALJ erred in the following ways: 1) Erroneously discounting the opinion of treating physician D.O. Legere-Struntz without giving good reasons for doing so; 2) Drafting an RFC that is not supported by medical evidence and improperly impugning Adams' credibility; 3) Failing to discuss whether Adams could perform work on a consistent basis; 4) Failing to discuss Listing 1.04 regarding Adams' spine ailment; 5) Failing to properly discuss Adams' past relevant employment at Step

24

Four. Adams also argues that remand is appropriate pursuant to sentence six of 42 U.S.C. § 405(g), because certain evidence was not available to the state agency consultative physicians. These arguments will be addressed in turn.

### 1. The ALJ Gave Good Reasons for the Weight Given to D.O. Legere-Struntz's Findings

Adams first asserts that the ALJ improperly rejected D.O. Legere-Struntz's findings without giving the requisite "good reasons" for doing so, including consideration of the length, frequency, and nature of treatment, the supportability of the physician's opinion, and the physician's specialty. (*Id*. at 17-18). The ALJ gave sufficient "good reasons" to discount her findings. Specifically, the ALJ noted that her suggestion to Adams that he seek disability was a "one sentence" statement, which lacked any explanation regarding the manner in which Adams was disabled, his residual functional capacity, or even clarifying whether Adams would be disabled temporarily or permanently. (Tr. 17). Furthermore, the ALJ asserted that D.O. Legere-Struntz's notes from that October 2011 offer scant justification for her finding of disability. (Tr. 17, 513). While that physician found that Adams had chronic pain of the cervical spine and suffered from severe pain for several days after attempting to work, there are no objective findings, *e.g.* ability to lift, stand or squat, which would suggest that Adams was disabled. In January 2011 Adams was performing "a lot" of wood chopping and hauling, and by his own estimation was "doing well." (Tr. 325). He did not seek treatment from any physician until October 2011, whereupon he asserted that he was experiencing constant

25

back pain, ranging from minor to extreme. (Tr. 513). While Adams' latter medical records reveal consistent complaints of back pain, an MRI of his spine in early 2013 revealed only "left sided neural foraminal stenosis at C6/7," and an electrodiagnostic exam revealed only evidence of minimal carpal tunnel, some sensory problems in the upper left limb, and distal median neuropathy on the left side. (Tr. 460, 543). In his most recent medical records, produced in April and July 2013, Adams had few complaints regarding his back and left upper limb ailments, and received no treatment for those ailments. (Tr. 486-89). Adams' records also generally indicate that he retained full strength in his limbs throughout his treatment. (Tr. 237, 305, 323, 327, 446, 452, 465, 473). Perhaps most harmfully, Adams admitted in his final medical transcript prepared by D.O. Legere-Struntz in July 2013 that he "[w]as recently camping and tubing down the AuSable."[2] (Tr. 486). In short, D.O. Legere-Struntz's notes are largely recordings of subjective complaints without objective support; she rendered no opinion regarding Adams' functional limitations, and her statement that he should seek disability was wholly unsupported by evidence. The ALJ thus gave sufficiently "good reasons" for assigning no weight to D.O. Legere-Struntz's statements.

---

[2] While the ALJ did not specifically discuss this piece of evidence, his finding that Adams' self-reports contradict his asserted degree of limitation is sufficient to encompass this evidence. (Tr. 17).

2.     *The ALJ's RFC Assessment and Credibility Determination Were Supported by Substantial Evidence*

Adams next argues that the ALJ erred by rendering an RFC assessment not supported by substantial evidence. Specifically, he asserts that "there is clear objective evidence which supports a finding of disability including MRI test results, surgical procedures, failed conservative treatment (physical therapy and epidural injections)," that the ALJ's RFC "did not even include the primary physician records," and "no reference in the hearing testimony relating [to] the significance of the objective findings below the fusion site." (Doc. 13 at 20-21).

It cannot be doubted that Adams' medical records contain numerous reports of pain, and findings of serious spinal problems. Adams underwent fusion of the cervical spine, and reported pain following that surgery on a generally consistent basis between December 2009 and August 2013. (Tr. 44-47, 541). While Adams on one occasion eschewed the use of medication (Tr. 331) and on another turned down an offered exploratory surgery (Tr. 484), he sought treatment nearly thirty times between his 2009 surgery and last appointment in 2013, and underwent a series of three pain relieving injections in an attempt to mitigate his back pain in early 2013. (Tr. 460-470).

In examining whether the ALJ's decision is supported by substantial evidence, it may be helpful to examine each of the ways in which he supports his finding. First, the ALJ asserts that "the claimant's allegations of impairment were not supported by objective evidence," because Adams received "conservative treatment after his spinal

27

fusion," and because the findings of his physicians were "essentially unremarkable." (Tr. 16-17).

The objective medical evidence supports Adams' assertion of chronic back and arm pain, but does not support his asserted degree of limitation resulting from that pain. Prior to his surgery, Adams experienced moderate to severe right foraminal stenosis with impingement at C3-C4, C4-C5, along with impingement of the nerve at C5 and some stenosis at C5-C6 and C6-C7. (Tr. 232-33). Following his surgery, Adams was found in January 2010 to suffer from moderate degenerative disc disease at C6-C7 (Tr. 408); in March 2010 he showed narrowing of the anterior aspect of C3-C4 disc space (Tr. 398-99); in August 2010 he showed early cervical spondylotic changes at C3-C4 with moderate cervical spondylotic changes at the C6-C7 level (Tr. 525); an EMG performed in February 2013 revealed bilateral median mononeuropathy in the carpal tunnel (Tr. 453); and an MRI performed in February 2013 showed left sided neural foraminal stenosis at C6-C7 (Tr. 460-62). Adams was consistently found to retain full strength in all extremities. (Tr. 237, 305, 323, 327, 446, 452, 465, 473). Adams' final treatment sessions generally focused on the treatment of a rash, and contained little mention of his back or arm ailments. (Tr. 486-91).

It is also notable that only one physician, D.O. Hedstrom-Lara, discussed the possibility of surgery following Adams' 2009 spinal fusion, which was an exploratory surgery that Adams declined. (Tr. 484). While Adams frequently sought treatment for back pain, his medication regimen was generally unchanged throughout his treatment,

28

and as of April 2013 was using only one pain relief medication, and reported pain at an intensity of four out of ten. (Tr. 491).

The ALJ also cites several pieces of evidence which challenge Adams' credibility regarding his asserted degree of pain and limitation. In particular, he notes that Adams admitted to chopping and hauling large pieces of wood for his stove, along with engaging in recreational hunting and fishing. (Tr. 15). The ALJ thus concludes that Adams' "own self-reports to providers were not consistent with his allegations of disability and limitation." (Tr. 17). This conclusion requires some additional explanation. Adams' self-reported level of activity was indeed inconsistent with disability through January 31, 2011, which was the last date upon which Adams spoke of performing wood chopping. (Tr. 325). On that date, Adams reported that his worst pain was three out of ten (*id.*); by October 20, 2011, Adams reported experiencing pain that ranged from "minimal to extreme," and that he experienced severe and disabling pain for several days after attempting to perform a day's work (Tr. 513). Similarly, whereas Adams told a physician in December 2010 that he regularly went hunting and fishing (Tr. 332), Adams wrote in his June 2012 function report that he was unable to walk the distances necessary to hunt, and rarely went fishing or camping (Tr. 205). At the August 2013 hearing before the ALJ, Adams testified that he was unable to hold a gun or fishing rod, and thus could not engage in hunting or fishing. (Tr. 46). If the record ended here, the question of whether the ALJ's decision was supported by substantial evidence would be a close one.

29

While Adams admittedly retained some ability to participate in his outdoor hobbies through June 2012, his medical records and self-reported limitations generally indicate that his spine an arm conditions worsened following October 2011; the record could thus be read to support Adams' claims of disability at some point in 2012 or 2013. However, this interpretation is confounded by one record which no party specifically references: in July 2013 Adams reported that he "[w]as recently camping and tubing down the AuSable." (Tr. 486). This record discredits Adams' assertion that he suffered from consistently worsening pain related to his arm and spine condition, providing good reason to question the veracity of Adams' statements regarding the severity of his pain and his limited ability to engage in hunting, fishing, wood chopping, camping, and other strenuous activities. (Tr. 486). This record also contradicts Adams' August 2013 assertion that he was unable to sit for more than ten to fifteen minutes at a time, as common sense dictates that "tubing down the AuSable" would require more than fifteen minutes of sitting. (Tr. 40-41, 486). This record also gives good reason to doubt Adams' report that he could be "perfectly good one hour, and the next hour I feel like I could lay down and die somewhere," particularly given that he asserted that he experienced such extreme pain four or five times a day. (Tr. 36).

There is also a notable dearth of objective findings or doctor notes regarding Adams' alleged difficulty sitting in the record. In his June 2012 function report, Adams wrote he could sit for one hour without pain. (Tr. 201). Adams apparently only mentioned his sitting limitations to Dr. Krieger of the state disability determination

service in July 2012, wherein he asserted that he could sit for an hour without pain. (Tr. 443). Adams sharply reduced this number to "ten to fifteen minutes" in his statements before the ALJ in August 2013. (Tr. 40-41). Adams apparently never complained of difficulty sitting when treating with his various physicians, and no apparent cause for his sharp decline in sitting ability between 2012 and 2013 can be found in the record. Again, while the ALJ did not specifically cite this inconsistency as a justification for his decision, the ALJ's finding that Adams' condition was "generally normal," that his treatment was generally conservative, and that his treatment records indicate at least the level of functionality identified by Dr. Choi are sufficient to encompass this reasoning. (Tr. 16-17).

Thus, while the ALJ can be said to have produced a somewhat lackadaisical decision, and did not specifically cite every piece of evidence impugning Adams' credibility, he did a sufficient job of noting the inconsistency between Adams' reported level of disability and his own self-reported hobbies, and properly noted the generally conservative treatment for his ailments following his 2009 surgery.

### 3.    Adams' Other Claims Are Non-Meritorious

Adams also argues that the ALJ erred by failing to discuss whether his work could be performed on a consistent basis, failed to discuss Listing 1.04, and failed to discuss his past employment. Additionally, Adams argues that remand is appropriate pursuant to sentence six of 42 U.S.C. § 405(g).

31

First, as courts around the country have repeatedly found, "an RFC implicitly includes the determination on whether the claimant can sustain a regular work schedule." *See Houston v. Comm'r of Soc. Sec.*, No. 14-14426, 2015 WL 5752720, at *18 (E.D. Mich. Aug. 25, 2015) (compiling cases) report and recommendation adopted, No. 14-14426, 2015 WL 5729079 (E.D. Mich. Sept. 30, 2015). The ALJ was thus not required to specifically state that his RFC assessment assumed Adams was capable of sustaining a regular work schedule.

Second, while Adams suggests that the ALJ "failed to consider the application of Listing 1.04 in the decision," he does not point to evidence sufficient to meet that listing. (Doc. 13 at 21-22). Listing 1.04 relates to disorders of the spine. Specifically Listing 1.04A refers to evidence of nerve root compression characterized by specific clinical findings; Listing 1.04 B refers to spinal arachnoiditis, confirmed by an operative note or tissue biopsy, and Listing 1.04C refers to lumbar spinal stenosis that results in certain findings on diagnostic imaging techniques and certain specified physical limitations. 20 C.F.R. Part 404. To warrant remand, "[a] claimant must do more than point to evidence on which the ALJ could have based his finding . . . [r]ather, the claimant must point to specific evidence that demonstrates he reasonably could meet or equal every requirement of the listing." *See Smith-Johnson v. Comm'r of Soc. Sec.*, 579 F. App'x 426, 432 (6th Cir. 2014). Here, Adams merely suggests that there are "clear indications of a spinal injury," including "the surgical procedure and the fact that objective evidence indicated further deficit at a level below the fusion." (Doc. 13 at 22). This non-specific reference to

32

the medical record cannot support remand. For his part, the ALJ sufficiently explained why Adams did not meet this listing by evaluating in detail the objective findings relating to Adams' spinal impairments. (Tr. 14-17). Thus, no error can be found on this point either.

Third, Adams' complaint that the ALJ did not evaluate his ability to perform his past work is a misreading of the ALJ's decision. (Doc. 13 at 14, 20). The ALJ stated in his decision that Adams was unable to perform his past relevant work. (Tr. 18). The ALJ did not identify Adams' past relevant work by title in the decision, but instead referenced the oral hearing in which the issue was thoroughly discussed with the VE. (*Id.*). This incorporation by reference is more than sufficient to satisfy the ALJ's burden. Even if the ALJ erred at Step Four, his Step Five finding that Adams is able to perform jobs which exist in a substantial number in the national economy would render any Step Four error harmless. *See, e.g., Martinez v. Astrue*, 316 F. App'x 819, 824 (10th Cir. 2009) (finding a Step Four error harmless in light of an alternate Step Five finding); *Rice v. Comm'r of Soc. Sec.*, No. 12-CV-15690, 2014 WL 521045, at *8 (E.D. Mich. Feb. 10, 2014) (same). Furthermore, it is somewhat quizzical why Adams takes issue with this portion of the ALJ's decision. Whether a claimant can perform his or her past relevant employment is determined at Step Four of the five-step sequential analysis; as noted above, through Step Four the claimant bears the burden of proving the existence and severity of their limitations. *See Jones*, 336 F.3d at 474. Even if the ALJ failed to properly consider whether Adams was able to perform his past relevant work, this failure would inure to

33

Adams' benefit, making it more likely that he would receive benefits. *See Roby v. Comm'r of Soc. Sec.*, No. CIV.A. 12-10615, 2013 WL 451329, at *4 (E.D. Mich. Jan. 14, 2013) ("[T]he ALJ's finding of no past relevant work was actually favorable to Plaintiff. Thus even assuming the ALJ somehow erred in concluding that Plaintiff had to prior relevant work, any such error was harmless to Plaintiff.") report and recommendation adopted, No. 12-CV-10615, 2013 WL 450934 (E.D. Mich. Feb. 6, 2013).

Finally, Adams asserts that remand pursuant to sentence six of 42 U.S.C. § 405(g) is appropriate because the state agency consultative physicians, Drs. Choi and Pinaire rendered their decisions without the benefit of "the treating physician's notes which indicate psychiatric, cardiac, and GI conditions." (Doc. 13 at 28). Adams has simply misconstrued the purpose of sentence six remand. Remand pursuant to that provision is "appropriate only when the district court learns of evidence not in existence or available to the claimant at the time of the administrative proceeding that might have changed that proceeding's outcome." *Sullivan v. Finkelstein*, 496 U.S. 617, 618 (1990). Here, all relevant medical records were available to the ALJ at the time of the administrative hearing; whether those records were available to the state agency consultative physicians is irrelevant to this inquiry, thus remand under sentence six is not appropriate.

### H.   Conclusion

For the reasons stated above, the Court **RECOMMENDS** that Adams' Motion for Summary Judgment (Doc. 13) be **DENIED**, the Commissioner's Motion (Doc. 16) be **GRANTED**, and that this case be **AFFIRMED**.

III.    **REVIEW**

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2). *See also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed.2d 435 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection

No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections

are without merit, it may rule without awaiting the response.

Date: December 8, 2015                    S/ PATRICIA T. MORRIS
                                          Patricia T. Morris
                                          United States Magistrate Judge


### CERTIFICATION

I hereby certify that the foregoing document was electronically filed this date
through the Court's CM/ECF system which delivers a copy to all counsel of record.

Date: December 8, 2015                    By s/Kristen Krawczyk
                                          Case Manager to Magistrate Judge Morris


36